UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DENNIS P. REIBER,

                                 Plaintiff,

**REPORT AND RECOMMENDATION**

v.

14-CV-978V

NANCY A. BERRYHILL, Acting
Commissioner of the Social Security
Administration,[1]

                                 Defendant.
_____

This case has been referred to me for supervision of pretrial proceedings, including the preparation of a Report and Recommendation on dispositive motions [16][2]. This is an action brought pursuant to 42 U.S.C. §405(g) to review the final determination of the defendant Acting Commissioner of Social Security that plaintiff was not entitled to Social Security Supplemental Income benefits ("SSI"). Before me are the parties' cross-motions for judgement on the pleadings [7, 11].

For the reasons stated below, I recommend that this case be remanded to the Acting Commissioner for further proceedings.

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit.

[2] Bracketed references are to the CM/ECF docket entries.

**PROCEDURAL HISTORY**

Plaintiff protectively filed an application for SSI on July 1, 2004[3] (T. 75, 127-32).[4] His initial application was denied, and an administrative hearing was subsequently held before Administrative Law Judge ("ALJ") Timothy McGuan on April 25, 2013 (T. 29). On May 30, 2013, ALJ McGuan determined that plaintiff was not disabled (T. 22). The Appeals Council denied plaintiff's request for review on October 24, 2014, making the ALJ's determination the final decision of the Acting Commissioner (T. 4-8). Plaintiff thereafter commenced this action.

**BACKGROUND**

Plaintiff was born in 1972 (T. 138) and was 40 years old at the time of the hearing (T. 45). He alleges that he has been disabled since July 1, 2004 (T. 127), due to the loss of his left hand, a stomach condition, anxiety and depression (T. 142). He has a ninth grade education (T. 45). His past relevant work included jobs as a laborer, a stock person at a convenience store, and a parking valet (T. 144).[5]

Plaintiff testified that his anxiety makes it difficult for him to be around other people and that he experiences panic attacks multiple times a day (T. 46, 58). He has been treated for anxiety and alcohol dependence at Spectrum Health Services[6] ("Spectrum") (T. 48, 55).[7] His

---

[3] Although the docket reflects that the administrative record in this case was manually filed in paper form (see docket entries dated February 23, 2015 and February 25, 2015), no such record could be located among the files kept by the Clerk of the Court. The Acting Commissioner subsequently filed the electronic court administrative record ("eCAR"). [18].

[4] References denoted as "T" are to the transcript of the eCAR as reflected in the white box in the upper left corner of the menu bar (which typically is the same as the number in the bottom right corner of each page).

[5] Plaintiff also testified that he worked various warehouse and painting jobs "off the books" (T. 51).

[6] The medical records from Spectrum suggest that plaintiff also had a history of crack cocaine and marijuana use (T. 55).

[7] A prescription for pain medication was stopped because plaintiff's counselor thought he was abusing them (T. 60).

left hand was amputated after he was shot in the hand and stomach outside of a bar in August 2011 (T. 31, 46, 52).[8]  Plaintiff stated that the loss of his hand limits his ability to lift more than ten pounds (T. 47) and makes him drop things (T. 53). He stated that as a result of the shooting he still experiences pain, and was told he would need further abdominal surgery after he stops smoking (T. 52).

A vocational expert, Mr. Jay Steinbrenner, testified at the administrative hearing (T. 63). ALJ McGuan posed a hypothetical question involving an individual who "has no limitations of sitting, no limitations of standing or walking[9]; can lift up to 10 pounds, frequently; there's no use of the left hand, such as – for things such as fingering, handling, and grasping; and there's no limits to the use of the right dominant are or hand. [The] individual would have to avoid concentrated exposure to cold, and can frequently interact with the public" (T. 63).  Mr. Steinbrenner responded that such a person could perform telephone survey work and telephone solicitation work (T. 64). However, upon cross-examination, he testified that if the person in ALJ McGuan's hypothetical could not interact with the public, then he could not perform any type of work (T. 65).

ALJ McGuan determined that plaintiff's severe impairments included "left hand traumatic amputation from a shotgun blast with hypersensitivity at median and ulnar nerve stumps, and anxiety (T. 28). He found that plaintiff could perform sedentary work as defined in 20 C.F.R. §416.967(a) "except sit, stand, or walk for a total of eight-hours in an eight-hour workday, frequently lift and carry up to ten pounds, never use left hand for fingering, handling,

---

[8]  Plaintiff had initially testified that he "was walking down the street, and some guy came out of his apartment. I happened to be right in front of a bar. And I don't know if he, you know, figured I was at the bar, or what was going on, but he's telling me to turn the music down" (T. 46).  According to plaintiff, he told the man that he was "not there to argue" with him, but the man shot him (T. 46-47). He testified that after he was shot he went "back inside the bar" (T. 47), eventually admitting that he had been in the bar drinking prior to the incident (T. 50). Hospital records state that plaintiff was shot "post bar argument where an antagonist pulled out shotgun and shot [plaintiff] transversely across the abdomen, pulling off his left hand in the process" (T. 315).

[9]  Plaintiff testified that he did have difficulty sitting more than ten minutes (T. 56) and standing more than five minutes (T. 57).

- 3 -

and grasping, constantly use right had for fingering, handling, and grasping, frequently interact with the general public, and avoid concentrated exposure to cold temperatures" (T. 30).

## ANALYSIS

### A. Standard of Review

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (*quoting* 42 U.S.C. §405(g)). Substantial evidence is that which a "reasonable mind might accept as adequate to support a conclusion". Consolidated Edison Co. of New York. Inc. v. NLRB, 305 U.S. 197, 229 (1938).

For purposes of entitlement to disability insurance benefits, a person is considered disabled when he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months". 42 U.S.C. §§423(d)(1)(A) & 1382c(a)(3)(A). Such a disability will be found to exist only if an individual's "physical or mental impairment or impairments are of such severity that [he or she] is not only unable to do [his or her] previous work but cannot, considering [his or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. §§423(d)(2)(A) & 1382c(a)(3)(B).

In order to determine whether plaintiff is suffering from a disability, the following five-step inquiry must be employed:

> "1.   The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

> 2. If not, the Commissioner considers whether the claimant has a 'severe impairment' which limits his or her mental or physical ability to do basic work activities.
>
> 3. If the claimant has a 'severe impairment,' the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.
>
> 4. If the impairment is not 'listed' in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.
>
> 5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform."

Shaw, 221 F.3d at 132; 20 C.F.R. §§404.1520, 416.920. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps. *See* Talavera v. Astrue, 697 F.3d 145 (2d Cir. 2012); 20 C.F.R. §§404.1520, 416.920. Moreover, the ALJ has an affirmative duty to fully develop the record where deficiencies exist. *See* Gold v. Secretary, 463 F.2d 38, 43 (2d Cir. 1972); Swiantek v. Acting Commissioner of Social Security, 588 Fed. Appx. 82, 84 (2d Cir. 2015) (Summary Order).

If a claimant has a mental impairment, the ALJ must employ the "special technique" identified in 20 C.F.R. §404.1520a to evaluate the claimant's symptoms and rate the degree of functional limitation resulting from the impairment. 20 C.F.R. §404.1520a(b). In doing so, the ALJ must consider all relevant and available clinical signs and laboratory findings, the effects of the symptoms, and how a claimant's functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment.

20 C.F.R. §404.1520a(c). The ALJ must rate a claimant's degree of limitation in four broad functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. §404.1520a(c)(3).[10]

With respect to assessing limitations in the first three functional areas, a five point scale is used: none, mild, moderate, marked, and extreme. In the fourth functional area, a four point scale is used: none, one or two, three, four or more. 20 C.F.R. §404.1520a(c)(4). To satisfy the "Paragraph B" criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A "marked" limitation means "more than moderate, but less than extreme"; one that "interferes seriously with [a claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.00(C). "Repeated" episodes of decompensation means "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks" or "more frequent episodes of shorter duration or less frequent episodes of longer duration" which are determined, in an exercise of judgment, to be "of equal severity". Id., §12.00(C)(4). *See also* Roach v. Colvin, 2013 WL 5464748, *8 (N.D.N.Y. 2013).

Where the ALJ concludes that the claimant has a severe mental impairment, he must then determine whether that impairment meets or equals a mental disorder listed in Appendix 1. 20 C.F.R. §404.1520a(d)(2). Mental impairments are addressed at §§12.01 *et seq*. of the Appendix 1 listings. If the mental impairment is severe but does not meet or equal the Appendix 1 listing, the ALJ must consider any limitations resulting from the impairment when making a residual functional capacity assessment. 20 C.F.R. §404.1520a(d)(3). When the

---

[10] These functional areas are also listed in §12.04B of the Appendix 1 listings and are referred to as the "paragraph B criteria."

plaintiff's impairment is mental, "care must be taken to obtain a precise description of the particular job duties which are likely to produce tension and anxiety, e.g. speed, precision, complexity of tasks, independent judgments, working with other people, etc., in order to determine if the claimant's mental impairment is compatible with the performance of such work." *See* Social Security Ruling 82-62 (1982); Farrill v. Astrue, 486 Fed. App'x 711, 712 (10th Cir. 2012).

### B. The Treating Physician Rule

On November 17, 2011, plaintiff was examined by Dr. John J. Callahan, plaintiff's treating hand surgeon, for a follow-up with respect to the amputation of his left hand (T. 366). He noted that plaintiff stated that he had improved "a little" but that "the pain continues to keep him awake at night". Id. Dr. Callahan assessed plaintiff's "degree of disability for this visit" to be "Total (100%)" and opined that "full recovery [was] not expected" (T. 368).

On December 29, 2011, Dr. Callahan again examined plaintiff "regarding his left hand traumatic . . . from shotgun blast and hypersensitivity at the median and ulnar nerve stumps" (T. 363). On this occasion, plaintiff reported that his symptoms had "worsened" and that he experienced "a lot of burning pain in his wrist since he stopped taking Oxycodone". Id. Once again, Dr. Callahan assessed plaintiff's "degree of disability for this visit" to be "Total (100%)" and that "full recovery [was] not expected" (T. 365).

In a report dated February 16, 2012, Dr. Callahan noted that plaintiff stated that his symptoms remained unchanged, and that he "has just as much pain as he did months ago" (T. 406). Dr. Callahan gave plaintiff an injection of Lidocaine (T. 409). He did not make a disability assessment on that date.

On May 31, 2012, plaintiff again reported to Dr. Callahan that his pain continued unchanged (T. 410). Dr. Callahan "recommended left revision amputation with excision neuroma of the median and radial sensory nerve and possible end to end median to ulnar nerve repair and placement under muscle" (T. 412). The surgery was performed on July 10, 2012 (T. 413). On July 24, 2012, plaintiff reported that his symptoms had worsened (T. 416). Dr. Callahan's office prescribed occupational therapy (T. 418).

On October 30, 2012, Registered Physician's Assistant Mark Orlowski from Dr. Callahan's office reported, somewhat inconsistently, that plaintiff was "feeling about the same compared to last visit. Patient feeling better since starting medication. Condition has been unchanged since last visit" (T. 485). Plaintiff reported that his pain was rated "2/10 in severity on average with medication". Id. No disability assessment was made, but as to plaintiff's work status RPA Orlowski noted "off work". Id.

Upon examination on January 23, 2013, Dr. Callahan stated that plaintiff "continues to experience pain" and that the "pain is worse with the cold weather" (T. 487). He noted that plaintiff was "off work" and did not make a disability assessment at that time. Id. The record reflects that plaintiff continued to receive pain management more than a year after the surgery to remove his nerve endings (T. 560, 562, 564). A September 18, 2013 report reflected that medication provided "30-40%" of pain relief for "3-4 hours" (T. 560).

Plaintiff argues that ALJ McGuan failed to give good reasons why he did not credit Dr. Callahan's opinion that plaintiff was totally disabled. Plaintiff's Memorandum of Law [7-1], p. 22. In his decision, ALJ McGuan does not discuss Dr. Callahan's statements that plaintiff was "totally" disabled.[11] Instead, he incorrectly states that "[n]one of the claimant's

---

[11] ALJ McGuan's only direct reference to Dr. Callahan was to state he "appreciated left wrist stump hypersensitivity that, initially, limitedly responded to prescription medication" (T. 31). He also noted that plaintiff had reported to Dr. Callahan that his symptoms increased when exposed to cold temperatures. Id.

- 8 -

treatment providers specifically stated that he was unable to perform work-like activities, or that he was 100% disabled" (T. 33).

The "treating physician rule" directs the Acting Commissioner to give controlling weight to the opinion of the treating physician so long as it is consistent with the other substantial evidence. Halloran v. Barnhart, 362 F.3d 28, 32 (2nd Cir. 2004) (*per curiam*); 20 C.F.R. §404.1527(c)(2). When an ALJ discredits the opinion of a treating physician, the regulations direct the ALJ to "always give good reasons in [the] notice of determination or decision for the weight [given a] treating source's opinion". 20 C.F.R. §404.1527(c)(2); Snell v. Apfel, 177 F.3d 128, 134 (2nd Cir. 1999).

The ALJ first must consider: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other significant factors. Halloran, 362 F.3d 28, 32; *see also* 20 C.F.R. §§404.1527(c)(2)-(6). Courts should not "hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion". Id., p. 33.

Here, the Acting Commissioner argues that although ALJ McGuan did not "explicitly mention" Dr. Callahan's opinion, he "implicitly considered" it because he referenced the reports in which Dr. Callahan made the statements. Acting Commissioner's Reply Memorandum of Law [11-1], p. 17. The Acting Commissioner then points to evidence in the record which, she argues, supports ALJ McGuan's finding that plaintiff is not disabled. Id., pp. 18-19. The Acting Commissioner also argues that ALJ McGuan was not required to consider Dr. Callahan's opinion because he was assessing plaintiff disability "for this visit". Id., p. 16.

It is not clear from the record whether Dr. Callahan's onion that plaintiff was totally disabled ever changed. After assessing plaintiff's disability as being "total 100%" on two occasions, subsequent reports by Dr. Callahan only noted that plaintiff was not working and did not include a disability assessment. ALJ McGuan's failure to seek clarification on this issue, or at least to acknowledge Dr. Callahan's opinion and articulate a basis to discount it, constitutes a legal error.

It is well settled that neither this court nor the Acting Commissioner may engage in *post hoc* efforts to determine what the ALJ would have decided had he considered the issue. Newbury v. Astrue, 321 F. App'x 16, 18 (2d Cir. 2009); Snell, 177 F.3d at 134 ("[a] reviewing court may not accept appellate counsel's *post hoc* rationalizations for agency action"). "[T]he propriety of agency action must be evaluated on the basis of stated reasons". Treadwell v. Schweiker, 698 F.2d 137, 142 (2d Cir. 1983).

The fact that ALJ McGuan made a summary reference to Dr. Callahan's reports does not reflect that he properly considered the opinion by plaintiff's treating physician in those reports. As stated in Halloran, ALJ McGuan was obligated to do more than merely refer to the reports from plaintiff's treating physician - he was required to provide "good reasons" why the treating physician's opinion should not be given controlling weight. Here, ALJ McGuan not only failed to give any weight to Dr. Callahan's opinion, he did not even note that Dr. Callahan *stated* an opinion as to plaintiff's disability. "[A]n ALJ's failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight given *denotes a lack of substantial evidence*, even where the conclusion of the ALJ may be justified based upon the record". Blakley v. Commissioner of Social Security, 581 F.3d 399, 407 (6th Cir. 2009) (emphasis in original); Harris v. Colvin, 149 F. Supp. 3d 435, 441 (W.D.N.Y. 2016).

The Acting Commissioner's reliance on Zabala v. Astrue, 595 F.3d 402 (2d. Cir. 2010), which stands for the proposition that ALJ McGuan was not required to reconcile every shred of evidence (Acting Commissioner's Memorandum of Law [12-1], p. 19), is not persuasive. In Zabala, the ALJ considered a treating physician's report, but discounted it on the incorrect factual basis that the report was incomplete and unsigned. 595 F.3d at 409. The court held that remand in that case was not necessary because the ALJ had properly considered a duplicative report containing the same opinion from the same physician. Id. Here, by contrast, ALJ McGuan failed to state any consideration of Dr. Callahan's opinion.

Indeed, with respect to the requirement that the ALJ or Appeals Council explain why a treating physician's opinion was not accepted, the Second Circuit stated in Snell:

> "Reserving the ultimate issue of disability to the Commissioner relieves the Social Security Administration of having to credit a doctor's finding of disability, but it does not exempt administrative decisionmakers from their obligation . . . to explain why a treating physician's opinions are not being credited. The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, even - and perhaps especially - when those dispositions are unfavorable."

Snell, 177 F.3d at 134.

ALJ McGuan did not acknowledge or provide good reasons to discount Dr. Callahan's opinion that plaintiff was disabled. Therefore, pursuant to Halloran and Snell, this case should be remanded for proper consideration of Dr. Callahan's opinion.

**C.   The Appeals Council Failed to Explain Its Rejection of New Evidence**

Plaintiff also argues that the Appeals Council erred by failing to provide any explanation as to why new evidence submitted upon appeal did not provide a basis for changing ALJ McGuan's decision. Plaintiff's Memorandum of Law [7-1], p. 22.

The record reflects that plaintiff was seen by various mental health care providers at Spectrum from 2007 through 2013 (T. 192-303, 425-480, 590-559, 576-579). Although ALJ McGuan found that plaintiff's anxiety was a severe impairment (T. 28), he determined that plaintiff's "pattern of failure to attend psychotherapy appointments" cast doubt upon the "symptom severity alleged" (T. 34).[12]

Upon appeal to the Appeals Council, plaintiff submitted reports from Psychiatric Nurse Practitioner ("NP") Jerry Frisicaro, his treating counselor at Spectrum (T.576). NP Friscicaro completed a mental impairment questionnaire dated August 1, 2013 stating that he had been treating plaintiff for "14 months, once monthly". Id. He diagnosed plaintiff as suffering from Post-Traumatic Stress Disorder ("PTSD"), major depression, and Attention Deficit Hyperactivity Disorder ("ADHD"). Id. He noted that plaintiff has had a "poor response to treatment". Id.

When asked for clinical findings, NP Frisicaro stated that plaintiff had "ongoing severe tenseness and traumas". Id. He stated that plaintiff's symptoms included hyperarousal, hypervigilance, avoidance,[13] depressed mood (moderate), cognitive limitations affecting his memory, processing abilities, attention, and comprehension. Id. He opined that these deficits had been present since birth, but that they had greatly increased since plaintiff's shooting. Id.

---

[12] Generally, a plaintiff's failure to attend some therapy sessions and follow up mental health treatment does not provide sufficient justification for discounting plaintiff's credibility. Moss v. Astrue, 2010 WL 3910182, *8 (W.D. Okla. 2010), report and recommendation adopted, 2010 WL 3910179 (W.D. Okla. 2010). "Courts considering whether a good reason supports a claimant's failure to comply with prescribed treatment have recognized psychological and emotional difficulties may deprive a claimant of 'the rationality to decide whether to continue treatment or medication." Pates–Fires v. Astrue, 564 F.3d 935, 945–946 (8th Cir.2009). See also Cornell v. Astrue, 2013 WL 286279, *8 (N.D.N.Y. 2013) ("Courts have observed that faulting a person with a diagnosed mental illness for failing to pursue mental health treatment is a questionable practice").

[13] According Diagnostic and Statistical Manual of Mental Disorders ("DSM-4"), published by the American Psychiatric Association, hyperarousal, hypervigilance, and avoidance are symptoms of PTSD. DSM-4, p. 464.

Plaintiff's global assessment of functioning ("GAF") was assessed to be no higher than 45 during the year prior to the report. Id. [14]

NP Frisicaro also noted plaintiff's "severe neuropathic pain exacerbated by chronic depression, high degree of anxiety, insomnia" (T. 578). He stated that plaintiff would have a marked limitation in the activities of daily living, and extreme limitations with social functioning and concentration, persistence or pace. Id. According to NP Frisicaro, plaintiff's mental disorder has caused more than a minimal limitation of his ability to work. Id. In his opinion, plaintiff would miss more than four days of work each month due to his impairment (T. 579).[15]

The Appeals Council considered NP Frisicaro's report (T. 5, 7) and the Acting Commissioner acknowledges that the report constituted "new and material evidence" and that the Appeals Council was required to "evaluate the entire record including the new and material evidence". Acting Commissioner's Memorandum of Law [11-1], p. 19. Nevertheless, the Appeals Council stated only that "[w]e found that this information does not provide a basis for changing the Administrative Law Judge's decision" (T. 6).

Plaintiff argues that the Appeals Council erred by failing to provide any explanation as to why NP Frisicaro's report did not provide a basis for changing ALJ McGuan's decision. Plaintiff's Memorandum of Law [7-1], p. 22. Plaintiff asserts that under Snell the Appeals Council was required to provide "good reasons" why it did not credit NP Frisicaro's report. Plaintiff's Memorandum of Law [7-1], p. 24.

---

[14]   The GAF scale found in the DSM-4 states that a score between 41 and 50 reflects: "[s]erious symptoms (e.g. Suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)". DSM-4, p. 34.

[15]   If NP Frisicaro's opinions were credited, plaintiff would likely be deemed disabled. A person who would miss more than four days of work per month could not perform any competitive work. Karabinas v. Colvin, 16 F. Supp. 3d 206, 213 (W.D.N.Y. 2014)

However, in Snell the Appeals Council decided to review the ALJ's decision *sua sponte*, and rendered its own decision which became the Acting Commissioner's final decision. 177 F.2d at 132. In this case, by contrast, the Appeals Council denied plaintiff's request for review of ALJ McGuan's decision, leaving it to become the Acting Commissioner's final decision.

It is not clear that the Appeals Council must always provide "good reasons" for failing to credit newly submitted material evidence when denying review of an ALJ's determination. Although several district courts in the Second Circuit have held that the Appeals Council is required to do so,[16] in Lesterhuis v. Colvin, 805 F.3d 83 (2d Cir. 2015), the court expressly declined to rule on the issue, stating:

> "because we hold that the ALJ's decision was not supported by substantial evidence, we need not consider Lesterhuis's alternative argument that the Appeals Council has an independent obligation to provide 'good reasons' before declining to give weight to the new, material opinion of a treating physician submitted only to the Appeals Council and not to the ALJ. *See* 20 C.F.R. § 404.1527(c)(2)."

805 F.3d at 89. *See also* Messecar v. Colvin, 2016 WL 6574077, *4-5 (W.D.N.Y. 2016).

In Lesterhuis, however, the court determined that "once evidence is added to the record, the Appeals Council must then consider the entire record, including the new evidence, and review a case if the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record". Id. at 87, *citing* 20 C.F.R. §404.970(b). Similarly, Lesterhuis requires that when reviewing the final agency decision, the court must consider the entire administrative record, "*which includes the new evidence*, and determine, as in every case, whether there is substantial evidence to support the decision of the [Acting

---

[16]  *See, e.g.,* James v. Commissioner of Social Security, 2009 WL 2496485, *10 (E.D.N.Y. 2009); Lucas v. Astrue, 2009 WL 3334345, *5 (N.D.N.Y. 2009); Farina v. Barnhart, 2005 WL 91308, *5 (E.D.N.Y. 2005); Lebow v. Astrue, 2015 WL 1408865, *5 *adopted* 2015 WL 1439270 (S.D.N.Y. 2015); Rayburn v. Colvin, 2015 WL 8482780, *3 (W.D.N.Y. 2015).

Commissioner]". Id. (emphasis added). Thus, in Lesterhuis, the court found that the ALJ's decision was not supported by substantial evidence because the new information "contradicted the ALJ's conclusion in important respects". Id. at 88.[17]

Here, NP Frisicaro's report contradicted ALJ McGuan's conclusion in two ways: it stated that plaintiff had been regularly attending psychotherapy appointments; and it suggested that plaintiff was incapable of substantial gainful activity because he would miss more than more than four days of work each month due to his impairment (T. 576-79). While this evidence may not be entitled to controlling weight because it comes from an nurse practitioner and not a physician,[18] it must still be considered and may alter the weight of the evidence. Today NPs and physician's assistants ("PAs") are increasingly the primary medical providers to many patients who have limited access to physicians. Often, the reports and opinions by an NP or PA are the only evidence in the record for substantial intervals of time. Accordingly, in Beckers v. Colvin, 38 F. Supp. 3d 362, 371 (W.D.N.Y. 2014), the court stated:

> "although a nurse practitioner's opinion is not entitled to the same weight as a treating physician, these opinions are entitled to "some extra consideration," when the nurse practitioner has a treating relationship with the patient. Mongeur v. Heckler, 722 F.2d at 1039 n. 2; see also Kohler v. Astrue, 546 F.3d 260, 268 (2d Cir.2008) (finding that the ALJ was not required to give controlling weight to the plaintiff's nurse practitioner, but should have given her opinion some consideration where the nurse practitioner was the only medical professional available to the plaintiff for long stretches of time)". [19]

---

[17] While such a standard would seem to require some analysis of the newly submitted evidence in relation to the record as a whole. The court cautioned against making factual and medical determinations about the evidence before the agency. Id. at 88-89. Thus, in Davis v. Colvin, 2016 WL 385183, *6 (W.D.N.Y. 2016), the court framed the issue as whether the new information "altered the weight of the evidence so dramatically as to require the Appeals Council to take the case."

[18] "[N]urse practitioners and physicians' assistants ("PAs") are defined as 'other sources' whose opinions may be considered with respect to the severity of the claimant's impairment and ability to work, but need not be assigned controlling weight." Genier v. Astrue, 298 F. App'x 105, 108 (2d Cir.2008), citing 20 C.F.R. § 416.913(d)(1).

[19] It is not clear from the record whether NP Frisicaro was treating plaintiff under the supervision of a physician. Some courts have held that under circumstances involving such supervised treatment, the opinion of an NP or PA

Moreover, the Social Security Administration rulings *require* information from such sources to be considered. *See* 20 C.F.R. 416.913(d)(1). As Social Security Ruling ("SSR") 06-03P, 2006 WL 2329939, [20] explains:

> "With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file."

Id. at *3. Indeed, the SSR states that "[a]lthough there is a distinction between what an adjudicator[21] must consider and what the adjudicator must explain in the disability determination or decision, *the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning*, when such opinions may have an effect on the outcome of the case. Id. at *6 (emphasis added).[22]

---

"based on the course and scope of such supervised treatment . . . deserves the same weight as that of a treating physician." Argeris v. Colvin, 2016 WL 3951089, *2 (E.D.N.C. 2016) ([T]his Court has previously held that "where a physician's assistant has treated a patient under the supervision of physicians and renders an opinion based on the course and scope of such supervised treatment, the physician's assistant's opinion deserves the same weight as that of a treating physician"); Palmer v. Colvin, 2014 WL 1056767, *2 (E.D.N.C. 2014) (same as to an NP). This is currently a minority view.

[20]   SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration". Nelson v. Apfel, 210 F.3d 799, 803 (7th Cir. 2000) (internal citations omitted); *see* 20 C.F.R. §402.35(b)(1). While the Court is "not invariably bound by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating". Liskowitz v. Astrue, 559 F.3d 736, 744 (7th Cir. 2009).

[21]   The Appeals Council is an "adjudicator" even where it merely denies review of an ALJ's decision. *See* Martinez ex rel. T.P. v. Colvin, 2013 WL 1194234, *2 (N.D. Texas), adopted 2013 WL 1197743 (N.D. Texas 2013) (the adjudicator of a claim is "not just the ALJ, but any entity adjudicating a claim for benefit o[n] behalf of the Commissioner").

[22]   While Snell is not controlling on this issue in this case, its rationale that an explanation is required so that a claimant can understand why benefits are being denied, is consistent with the rationale expressed in SSR 06-03P.

While the record here includes a single-examination consultative report by Dr. Susan Santarpia (T. 377), and a non-examining consultative report from Dr. J. Echivarria (T. 381), both were made in March 2012. NP Frisicaro's report, dated almost 18 months later, deals with the time period subsequent to those reports and indicates that plaintiff's symptoms had markedly worsened over time (T. 576). The record does not reflect a functional capacity opinion from a psychiatrist or anyone other than NP Frisicaro regarding plaintiff's mental status during this intervening time period.

Thus, NP Frisicaro's opinion appears to be the only opinion by a mental health provider relating to plaintiff's mental health status during the extended time period between the consultative examinations and the decisions by ALJ McGuan and the Appeals Council.[23] While not necessarily entitled to presumptive weight, if it were considered (as it should have been), it would likely require an outcome different from that decided by ALJ McGuan. Therefore, upon review of the entire record, including the new material submitted by NP Frisicaro, as required under Lesterhuis, I cannot conclude that ALJ McGuan's decision is supported by substantial evidence.

I have recommended that this case be remanded on other grounds. On remand, the Acting Commissioner should also more fully consider and explain the report of NP Frisicaro,

---

Thus, it has been held that an ALJ may not completely disregard an opinion from an "other source" (such as an NP or PA) merely because it is not from an "acceptable medical source." Sanchez v. Commissioner of Social Security, 2014 WL 4678282, *3 (E.D. Cal. 2014); see also Meza v. Astrue, 2012 WL 5874461, *3 (C.D.Cal. 2012) ("Statements from 'other sources' are competent evidence that an ALJ must take into account, unless he expressly determines to disregard such evidence and gives reasons germane to each witness for doing so.").

[23]   The Kafkaesque scenario sought to be avoided in Snell and SSR 06-03P is present here – plaintiff's primary treating mental health provider has opined that he is disabled, however, benefits have been denied without any account for that opinion by ALJ McGuan or the Appeals Council.

and if appropriate, obtain an updated psychiatric report relating to plaintiff's limitations, if any, resulting from his mental impairment.[24]

## CONCLUSION

For these reasons, it is recommended that plaintiff's motion for judgment on the pleadings [7] be granted to the extent that this case is remanded to the Acting Commissioner for further proceedings consistent with the above. The Acting Commissioner's motion for judgment on the pleadings [11] should be denied.

Unless otherwise ordered by Judge Lawrence J. Vilardo, any objections to this Report and Recommendation must be filed with the clerk of this court by April 11, 2017. Any requests for extension of this deadline must be made to Judge Vilardo. A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection . . . supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new

---

[24]  Plaintiff also argues that due process considerations require a remand so that he can be given an explanation as to why benefits were not warranted in light of NP Frisicaro's report. Plaintiff's Memorandum of Law [7-1], p. 26. Because I have found that remand is appropriate under Lesterhuis, this issue need not be reached.

arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objections.

Dated: March 28, 2017

/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge
